Thank you, Mr. Johnson. Thank you, Your Honor. I'm reserving five minutes. I'm not going to bore you with all of the, or by regurgitating the briefs, but I have some specific points I'd like to make. The first one I'd like to make is that in this case, the materiality standard that was applied by the court was incorrect and not supported by the record. In the prosecution of the patents below, in the 716 patent, which was a patent that issued Hughes, there were five references discussing telephone systems after the virus and 12 three-note systems before the examiner tracked them. At the time of this, a bigger reference was being discussed in the 009 reference. As a result, to say that Baker would have added anything of material substance which would have given rise to Mr. Shuman having done an analysis was simply not supported by the facts. In fact, the record is devoid of the information the court would have needed in order to have a claim at all. And that is, first, Mr. Shuman testified that he could not recall what he had done 20 years before. Second, the court pointed out that there were no written notes discussing Baker and an analysis of Baker that was contemporaneous at the time. The court took the view that the absence of those notes was somehow an indication of an evil intent on the part of Mr. Shuman. Instead of, as he should have done, appreciating the fact that Mr. Shuman was correct when he said that he did not believe that Baker was a material reference. What's your view of Mr. Shuman's statement to the court that there was a policy against citing references that had been cited in related cases? His statement was that there was a general policy that if you disclose the co-pending application, you need not cite activity in co-pending cases. And the court said, was there an instance in which you might do that? And he said, yes, if I believe it was material to that other reference. His policy was to cite all co-pending applications. And the law firm had forms which said, if you have a co-pending application, it must be disclosed. And that's, in fact, what happened in this case. But didn't he also testify that the law firm didn't have any means of tracking rejections? And therefore, it was the policy of the firm not to disclose a rejection in a co-pending application. That's correct. He did say that. And he said that against the background, that having disclosed the co-pending application. What would happen if the reason for the rejection was material to the prosecution of the other application? Then the individual attorney would have to make that note. But he said the firm had no way of tracking the rejection. But the individual attorney would. That is to say, when information came in, the individual attorney would know if, in fact, there had been a rejection that was material. That's different from saying, when a typical office action comes in, our clerks handle it a certain way. And that is essentially what happened in this case. It was a routine matter. Well, did Mr. Schuman actually testify that the reason why he didn't disclose the two rejections was because he made a judgment that the reasons for the rejections were immaterial to the application of the 716? No, he did not. Wouldn't he have had to make that? Say just what I just said in order to close the circle, if you will? No, I don't believe so, Your Honor, because he would have had to have a specific recollection of what happened at the time. And if he had made such a statement without the specific recollection, we would be here, and they would be arguing he committed perjury. So if, in honesty, he says, I can't remember. Isn't it so that he testified that he said, I don't have any recollection of any of this stuff? It's just no recollection of prosecuting anything. But if you want to ask me why I didn't disclose Baker or didn't disclose the two rejections, it's because I didn't think they were material. That's correct. What he said was that he had gone back and reviewed the record to refresh his recollection, and based upon that review, he did not find Baker material. He said, I could not recall with any specificity what had happened 20 years prior. So he was left with only the reflection. What are we to do with the trial judge's finding, as I read, that he didn't believe that Mr. Schuman was credible? I believe that that finding is clearly erroneous, because his statement that Mr. Schuman was not credible was not based on Mr. Schuman's recollection at the time, but rather the judge's belief that Baker was so important that Mr. Schuman should have found him to be material. Didn't the trial judge point out discrepancies in the deposition testimony and trial testimony of Mr. Schuman? Yeah, but those were not material discrepancies. He said, this was our policy, and this is what I did, and my recollection is I followed the policy. And so at the end of the day, the dispute was either, A, you didn't follow the policy, or alternatively, when you recalled the policy, you recalled it incorrectly. That was not evidence upon which a non-credibility finding could be based. Would you agree that Baker was material to the 149 application? That's the application in which the examiner then said these various claims are rejected based on Baker, in part. In part, but what was so important? Yeah, the answer is, I believe it was certainly of some materiality because the examiner believed it to be so, as it related to the handheld claim. And the claims that were at issue were method claims and one apparatus claims, not system claims. Well, I've gone back and looked at the claims that were rejected in the 149 and tried to compare them with the 719. And could you tell me, looking at the claims of the 149, you discussed this briefly in your brief, the sort of general terms, but I'd like some specificity for you to show me what limitations of significance are in the 719 that are missing from all of the rejected claims, the claims rejected over Baker from the 149. Well, I'm not sure I can do that on the fly because I don't have the charts that we had in front of us. Well, give me a sense of what's there. Because if you set them up side by side, particularly if you look at some of the dependent claims, it's hard to find anything of substance missing. And what I came up with was the alarm system. Right. Well, I think there's a lot more than the alarm system, and here's why. Tell me what. Here's the what. In the apparatus claim, you had a particular, obviously you had the keypad, you obviously had the display screen, you obviously had to have the ability to have a unique identifier or some identifier to communicate with the base station or with a base station. All of those, as I read it, were present in the 149. That is correct. So what's not present in the 149 that is present in the 716? The 716, the system did not require all of the elements in the 149 to operate as a handheld. There had to be a communication protocol, but it was not limited to the claims found in the 009. There had to be an ability to input information, specific information, relating to patients, which was not in the 149. It did not have input. It did not have input data, but the specific patient data that was disclosed was more focused in the system claim. But the test isn't whether the 716 and the 149 are exactly the same, isn't it? That's correct. The test is whether the reasonable examiner in the 716 would be interested to know what was going on over in the 149. That's correct. And the idea is that you probably err on the side of safety if you're prosecuting a claim so that the 716 examiner will know what the lab over on the 149 was doing. That's correct, Your Honor. Certainly, wouldn't you have to say that the content of the 149 is related to the content of the 716? You do. And then you have to look at what was in front of examiner-trafficking, and what was in front of examiner-trafficking were five separate cordless systems, some having programmable identifiers, all having base stations, and all having computers. So you then say, okay, let's look at what Lev did. Lev said that the Baker reference was only applicable because it had a particular address code. That's all it said. It did not say it was applicable in any way other than that as it related to the claims of the 009. And I will quote it to you. It said, Baker et al. discloses, and these are his typos, the additional features regarding address codes, period. That's it. So to answer your question, Judge Clevenger, because address codes were not only before the examiner-trafficking, but were not an issue in the prosecution of that particular claim, it makes perfect sense to say this is just another reference. But, of course, that requires hindsight on my part because I can't do any better than Mr. Shuman who said, look, I looked at it, and I wouldn't do anything different. And at the end of the day, the question becomes, if you say I looked at it, I wouldn't do anything differently, this is an address code, I already had those before the examiner-trafficking, I'd already disclosed the co-pending application twice. That evidence in and of itself absolutely indicates that there was no intent to deceive. If he had intended to deceive, he would have been required, as all of your cases- In the five references that were cited in the 716, is there any of those five references that discloses the three-node approach as explicitly as Baker does? Well, the answer is yes, Your Honor. Which one? The Hawkins reference. Hawkins, you think, discloses the three-node approach as explicitly as does Baker? Yes, and here's my reason. Because every three-node system has a computer, a base station, and some form of a wireless device. So to say it's disclosed implicitly is a non-separate. It can't be a three-node system unless it necessarily has those three components. And that's why we had the problem when we were advancing the arguments at all, when a three-node system, according to my opponent, is a point of novelty. If that were true, then every system that's three-nodes, in other words it's wireless, somehow becomes relevant. And since we disclosed numerous three-node systems, all of which had wireless applications, disclosing one more would make no difference. So what was argued below was, but Baker had a screen. The trial judge based its decision on three elements of non-disclosure, both individually and collectively, and said that any one of the three would have been enough for him to find that not possible. We haven't discussed explicitly the non-disclosure of the notice of allowability of the 372 patent. Correct. And in short, Your Honor, the notice of allowability was before the same examiner who had allowed the patent weeks before. There was no obligation to disclose the notice of allowability to examiner and traffickers. It's not a case where years had gone by. This was a matter of six weeks. And if it is the obligation to make a disclosure. I thought that case law was pretty clear from way back when that even when you've got the same examiner, I think that comes out of the old Armour v. Swift case that they say no matter how, to take a busy examiner, no matter how diligent, well-informed he may be, it was assumed that he retained details of every patent funnel in mind. That's correct, Your Honor. But that case involved a situation where the notice of allowability had been issued years before. We're talking about six weeks later. And we're also talking about a situation where the disclosure... I was surprised because the MPEP that was applicable at the time, actually cites an Armour v. Swift, and similarly suggested to me that you had a duty to assume that the busy examiner might not be able to remember. Well, in Akron, it was decided that disclosing to one examiner but not the other was sufficient to demonstrate a lack of intent. I believe that if you have a requirement that is not based on some substantial period of time, in effect you end up with two things. One, you adopt a rule that says the examiner is not doing his job and can't remember what he did six weeks before. And secondly, you are now creating a situation where the files are going to be papered even more than they already are. I do not believe that would be sound policy, and I do not believe it would make good sense. But more importantly, as far as my intent is concerned, if I now disclose the co-pending application to the person who's prosecuting, how can I possibly be trying to hide anything? And the same is true for the 009. Mr. Shuman was doing his job as best he could. If he were negligent, that wouldn't give rise to an intention to deceive. And in fact, on this record, the only evidence that we have of this intent is inference based on inference based on inference, because the facts simply don't support our reserve the rest of my time. We'll save you a little time, Mr. Jensen. Good morning, and may it please the Court. There is only one basis upon which this Court must find support in the record to affirm. And that is something that is important for us to remember here. This is the record that appears to support all of them. But this Court, you know, we need to reach only one. And in this particular case, I do believe Baker is particularly straightforward. You mean because the trial court said that any of the three would be sufficient? That is correct. But you're saying it wouldn't be true, I suppose, if the trial court had said you need all three collected. That is correct. That is correct. And the Court, I think, is very careful. The Court's a bit of a student of the decisions of this Court and the Ditchwich case that required that independence to avoid sending the matter back within the bindings. But the Court also, and I think it's worth noting, as part of the weighing, noticed that its decision was buttressed by the fact that there was also a pattern. It was independent of that and did not rely on that, but it did believe that it buttressed further its decision. And I want to comment a few points on some of the Court's questions so far. In terms of Baker and the whole address code, the record actually supports that Lev believed Baker was material to much more than the address code. The rejection specifically talks about Baker in the context of the address code. However, the interview notes reflect that when Examiner Lev discussed Baker with Mr. Shuman, he recommended to Mr. Shuman that he cancel claims 19 through 24. Claims 19 through 21 were apparatus claims, and 22 through 24 were the method claims, all of which contained all of the language. Pardon me? 21 through 24. Correct. And so that is the first point at which Mr. Shuman is informed Baker is significant to all of the elements that are in the 716 patent. And I think it's important to note that at that point nothing was done by Mr. Shuman. You're telling us that Baker is material. That's correct. Accepting my question that Baker is material, could you summarize the grounds for the separate finding of the tint, which is required for unenforceability? Yes, Your Honor. There are at least three bases. The first basis is this Court has recognized that when a patentee knows or should have known that art could be material, an inference of intent can be drawn. The Court found that in this instance. Then the materiality, where is the intent? No, no, the Court has found that when the examiner knew or should have known that matter could be material, an inference of intent can be drawn. A number of cases, Rassler, Bristol, specifically find that as a basis for intent. I mean, you know, we sat in back in Kingstown to try and put some substance to inequitable conduct and held that intent must be separately shown. We might talk about how strong the evidence has to be, but it is explicit that materiality of itself won't suffice. Negligence won't suffice. Gross negligence doesn't suffice. We're not talking about validity. Whether this patent is or isn't valid is not before us. So we have a patent that has withstood the citation of Baker. The question is now what in the prosecution was such that nonetheless it can't be enforced? And that's where intent comes in. Excellent question, Your Honor. And I believe that the knew or should have known standard is consistent with Kingstown in the following way. You don't want to rely on withholding a material reference in and of itself as evidence of intent. But when a patentee knows or should know that matter is material, that is a different act. It's not the act of withholding the reference. It's the act of deciding not to disclose it, even though they knew or should know it should be disclosed. The record says this man should have known for the following reasons. It's brought to his attention by an examiner. In one co-penned case where, to that point in time, the same references are produced in both cases. The same examiner said that they were having some weight as well. And I think that you're asking us for a blanket rule that any material reference that shouldn't have been known to be material requires a presumption of intent. And I don't think that's correct, Your Honor. The reason is it's not just that he knew or should have known. He knew or should have known. He didn't have a credible explanation. And the third reason, and there's facts supporting each of these legal issues, he knew or should have known. He didn't have a credible explanation. That's what the judge found. And thirdly, we know from Brasler that if you cultivate ignorance or if you ignore numerous warnings... Are you saying that this ignorance was cultivated even though the same reference was before the same examiner in a related case? Well, I believe that Mr. Newman, excuse me, that Mr. Shuman cultivated ignorance with respect to a number of the issues of disclosure and policy. But the holding with respect to... we focused on cultivating ignorance. But the holding in that case is he who cultivates ignorance or ignores numerous warnings that matter may be material gives rise to an inference of intent. That's the Hennessy case also cited in Bristol. And there were numerous warnings that Mr. Shuman received that Baker could be material. An examiner... Can I interrupt you for a second because I'm now, I think, a little confused. I understand that the citation of the co-pending application issue is before the same examiner. But I thought, and I may be mistaking this, but I thought that Baker was cited to abide, live, but not trapped. No, that's correct. That's correct. Baker was never before the examiner in the 719. 716. 716, yeah. That is absolutely correct. And I must have misspoken. Okay. And that brings an additional point of intent. We have the Bruno application. This is a stronger case than Bruno. We have selected disclosure. Clearly, Mr. Shuman, if you will, about Baker, knew that it was relevant to this aspect of technology because he disclosed it pursuant to his duty of candor, as he admitted on the stand, in the 441 prosecution before examiner used him. But yet he withheld it from the 716. That selected disclosure is prime evidence under Bruno of an intent to deceive. So you're saying that when there is a co-pending application, there is an obligation not only to say there's a co-pending application, which the examiner knew, but also to cite all the references, recite, explain all the references in the co-pending application, and explain why the claims are different and why they don't apply? Well, I don't think that's completely accurate, nor is what I'm arguing. I think there are co-pending applications. Material art for both applications need to be cross-cited. There's no question about that. And we know from DACO that adverse office actions need to be cited as well if they're substantially similar claims. Because we're talking about what we need to show is a wrongful intent, deliberate withholding, in order to deceive the examiner to do something that the examiner wouldn't have done if something had been told. So we're not just talking about what might or might not have been cited in someone's judgment. We have to show that this practitioner deliberately intended to do or not do something that would have affected what the examiner did eventually deciding the case. And in the expectation, it puts his reputation on the line. It puts the client on the line. It does all sorts of terrible consequences from inequitable conduct. And that's the way the law was evolving. And that's what led to Keenestown to try and bring objectivity to some of these extraordinarily difficult and complex prosecutions. And that's where I need help. Obviously, the trial judge didn't like, thought more shouldn't have been done. Practitioners might very well think that the practice was acceptable. If it was acceptable, then there has to be nonetheless a deliberate withholding of intent to deceive. And it would be helpful to me if you could focus on that. In this case, there is no direct evidence of intentional deception. We are relying on inference based on circumstantial evidence. But I think most cases need to rely on inference. And that is something that I understand the case law supports. The inferences here are dramatic. There is no other inference that can be drawn given the similarities of the 149 prosecution and the 716 prosecution. For example, in Akron Polymer, it was observed that a co-pending application would be highly material when there's a substantial overlap in the specification of the claim elements. Here, there's beyond a substantial overlap when you look at the canceled 149 claims that were canceled in part on Baker and the 716 application. It doesn't make sense that he would not produce that piece of art in the 716 case. Under those circumstances, he should have known better. And then when you add the fact that the co-pending application is appropriate in which these references were cited. So we need to focus on an obligation to specifically say, and also there are these other references which were cited in a related case, which should be cited because the relevance of having more than this case. The problem, Your Honor, is that Mr. Schuman himself testified that he understood that the duty of disclosure was broader than simply disclosing a co-pending application. Mr. Schuman's own expert, or McKesson's expert, Mr. Snigel, testified it's broader than just producing. On the theory that you chose the examiner as the co-pending application, there it is with the touch of a computer button. And all the references are before the examiner if there's any interest in them. But if we're talking about intent and what he knew or should have known, he admitted in the record and the patent law experts agreed that it was known at the time. That the duty of disclosure exceeded citing the co-pending applications. In fact, I believe we need to be overruled if this court were to conclude that there's no obligation to produce material information that arises in the co-pending case. So we have to say that having cited the co-pending case, there was culpable intent in stopping there and not going further in discussing the cases, the references that were cited in the co-pending case. I don't think that's accurate. I think under Akron-Polymer, you consider the fact that the applications were co-cited. That is something that goes into the mix of the facts that the court considers and weighs the issue of intent based on the influences of the evidence. And in this case, unlike Akron-Polymer, the court did acknowledge that, did weigh it against this other evidence of what he knew or should have known, the lack of a plausible credible explanation, the numerous warnings that should have put him on notice that this was material information. And yet, he selectively disclosed to one examiner but not to another. There were numerous warnings several times. Would you summarize what they are? Absolutely. Number one, examiner 11 calls Mr. Shuman. There's a telephone interview. It's the only telephone interview in both prosecutions. And he mentions only one piece of art. And to that point in time, there's the same art in both cases. That's Baker. That's Baker. Now, then I take it it's the first time Baker emerges. Absolutely. It wasn't originally sold in 149, right? Examiner Lev. So it was in the 149 application where you found Baker. Correct. Examiner Lev found Baker on his own and found that Baker was superior to all of the other three road systems, road systems. In fact, it has additional features. We have testimony at trial that says there's no better, no other art other than Baker shows the three road system of the 716 patent better than Baker. So he has a telephone call. And he's asked to, he's requested to cancel claims that include all of the elements of the 716 patent. He's requested to cancel it based on Baker. He doesn't disclose it. Then examiner Lev rejects the 149 patent, the claims of the 149 patent based on Baker. Then after that, he makes arguments in the 716 case that are inconsistent with what Baker teaches. Then he discloses Baker in the same technological subject matter in another co-opending case pursuant to his duty of candor. This is just like Criticom. Knew about the patent, knew or should have known it should have been disclosed, and didn't disclose it. And this court reversed a trial court finding that concluded based on the same facts that there was no inequitable conduct with instructions of inequitable conduct, and that judgment be entered. This is, I have to think this is an incredibly unusual case in the amount of notice and the number of warnings that a patent prosecutor would have received that Baker was important to an examiner and important to producer. And I just have a few minutes left. I just want to close with the point that I think that the appellate in this particular case has really, in terms of the factual findings, quibbled at the margins of what the trial court did. Back to the matter, there's no definite or firm conviction. Can I ask one question? We talked earlier sort of episodically about the trial judge's credibility findings. Was there any one of the credibility findings that merged into the intent issue? Your Honor, I'm out of time. May I answer? Please answer. Thank you very much. I think all of the credibility findings merged into the intent issue. Can you be a little more specific? It struck me that it was a mountain to climb for the appellate to get past the credibility findings because those are virtually unreviewable. Right, absolutely. So tell me specifically how the credibility finding affected the finding that there was a requisite line of intent here. On the stand, Mr. Schmidt argued with passion during the direct testimony that the 109 and the 149, as we're calling it, and the 716 are completely different. The 149 relates to the portable handheld terminal, and the 716 is a system plane. So there's a difference. It didn't make any sense to cite Baker in the 716 case because the 109 is just a portable handheld terminal case. Then he had to admit, he had to admit on the stand that actually the 149 does contain system planes and the rejected planes contain system planes. It was a patently false explanation, and the passion with which it was presented and the embarrassing way in which it was taken back was significant. That's number one. Number two, the position that we would never have disclosed these copaign applications. Nobody did it at the time. You would not do it. You would not do it. To then be confronted with this deposition testimony where it says, if it was relevant, of course you would do it. It must have been half an hour on the stand trying to explain that and ultimately just sticking with the answer to pay the trial. That had significant impact on the court and led the court, I think, appropriately to question whether Mr. Sheehan could be believed. Am I correct that the trial judge greeted the supposed emergency rule policy with some skepticism over whether it was made up late in the game? Absolutely. And then the final credibility issue is, because he doesn't have any present recollection that he did, but I'm sure Baker was reviewed and we concluded it was not material, given that Mr. Sheehan Was there ever any testimony from somebody from emergency rule testifying as to exactly what their policy was with respect to copaign application? No, Your Honor. And I don't. The answer is no. Thank you very much. Yes. Specifically on the issue of intent, counsel cited Akron and argued to you just now. Akron, there was disclosure of one copaigning application, but not the other. And this court said, but for the disclosure of the one, there would be, there was sufficient evidence to find intent. So in other words, the disclosure, the mere disclosure to one example was sufficient. In this case, and I want to emphasize it, Akron, there was also evidence that there was other activity, such as litigation, that existed. In the Bruno case, for example, there was evidence that a disclosure had been made to a different agency, but not to the PTO. As I recall, Akron, however, the real issue was whether or not the right number of inferences were being drawn for or against the attorney there in question. Correct. What inferences in this case did the trial judge fail to draw in favor of your comment? The trial court failed to draw and appreciate the inference that the disclosure of the copaigning applications to both examiners twice was sufficient to negative a finding of intent against the background that the witness testified that I cannot recall exactly what I did. As I recall the facts from Akron, they don't level up, they're not the same as this. You didn't have rejections in the copaigning application over a reference that had been found by the examiner and then brought to the attention of the prosecutor or the other application. That's correct. However, you had a rejection that was found in the copaigning application that related to subject matter that was before examiner attracted, where there were already several references that contained the same three-node system cordless phone. That's different than What is your response to your adversary's argument that Mr. Shuman, after having been alerted to Baker, continued to make arguments in the prosecution that were really not sustainable given the existence of Baker? He got it wrong. The fact of the matter is if you read the decision, you'll see exactly what happened. He made his argument about patentability based upon the inventionist's claim before the conversation with examiner left. Well, I mean, whether he may have made those arguments before, but he has to be taxed and continue entirely through the prosecution of adding in suit with what he had told. I mean, if I tell an examiner something on day one, and then six months later I learned that what I told him was groundless or could possibly be groundless or be misunderstood, I have a duty to bring that to the attention of the jury. That's true. That didn't happen to him. No, and guess what? And there was a reason. It wasn't groundless. That is to say, if you make the argument that Well, that goes back to the question of whether Baker's material. Well, that's correct. But it also goes to his intent. In other words, in order to find an intent, you have to believe that you knew about the reference, appreciated the significance, and made a conscious decision not to give it to a January trial. Well, but he's admitting, in effect, that there was a conscious decision made or that he comes close to that. He says, it doesn't have specific recollection. He says, we obviously must have looked at it and decided not to disclose it. So this is not one of those cases in which the issue of possible negligence or even gross negligence is presented. This is a case in which there was obviously, as far as the record shows, a determination not to disclose it. So it seems to me, for purposes of materiality intent, really, you have to stand on the question of whether or not this is material. Well, I beg to disagree. If you say, this is what I believe occurred, you can't say, using 20-20 hindsight, it had to have occurred. Well, that's pretty much what he's trying to recognize. Well, I mean, but, well. He says, obviously, the Baker reference had been received in the office from examiner 11. I've got to assume it was reviewed for materiality And that is a fair assessment of what he believed had occurred. But there's a fundamental difference between saying, that's what I believe occurred and what, in fact, occurred. And to say that you can get in it. She tells earlier that no one knows what, in fact, occurred. Your client testified, I don't really have any recollection, period. Correct. So I can't. He could have just sat down and said, I don't have any recollection. But it seemed to me that he put in play by saying, well, now that I think about it, it must be that we did review Baker and made a decision that it wasn't material. Well. That allowed the trial judge or your adversary to say, well, if you have reviewed Baker, let's go look at your notes. Maybe you'll find something in your file. And the answer is. They didn't find anything in the file. Correct. But that still, your honor, just 20-20 review based upon what you think might have happened. In order to find intent, all the cases that this court has dealt with where there was intent, there was independent evidence. That there was either you didn't tell us, you didn't do an investigation about an on sale bar. You didn't tell us that there was pending litigation. You didn't tell us you disclosed this to the FDA. You didn't tell us that there was other litigation going on when you made statements to the panel. None of that exists in this case. Are you suggesting that if there had been testimony from your client simply saying, I'm very sorry, but I have no recollection of the prosecution of any of these applications, they sat down, that it would be impossible to find inequitable conduct? No. What I am saying, it is impossible to find inequitable conduct in a situation where there was disclosure of both co-pending applications, which would clearly indicate an attempt to disclose. And I am saying that to the extent that you evaluate the record that was before the examiner drafted, where you had five courtless systems and 12 preliminaries. In order for you to bring up on that point, we would have to write an opinion that said the disclosure, lay out all the facts in the case, including Lev calling up Schuman and saying, hey, I found Baker, and I think it's good to do. We'd write all those facts up, and then we would say the duty of disclosure was completely satisfied by simply having pointed out to the other examiner that there was a co-pending application. I don't think you'd have to say it that way. I think you'd be safe. There was no duty to disclose the rejections. There was no duty to disclose Baker. And there was no duty to disclose the allowability of 372. Nonetheless, there's no inequal conduct because Schuman simply tipped off one examiner that there was something else going on in another application. And I would respond this way. One, I'm not saying there might not be a duty to disclose under certain circumstances. The question is, the simple fact that there was a telephone conference with an examiner. Can you tell me what additional here is to say that you're not going to argue in favor of a flat rule that says disclosure of a co-pending application alone is enough? It'd be hard to make that argument in the light of the impact that was in play at the time. Because the impact that was in play at the time called for more than just mere disclosure. Correct. And I'm not making that argument. Any activity in the co-pending doesn't occur. That's correct. And that's why I'm not making that argument. What I am saying, though, is look. Can you add a fact to the mix of these cases that would have made the disclosure of the rejections necessary to the first examiner? What more information would Schuman have had to have to trigger an obligation on him to inform the examiner of the 746? Correct. The specifics of that? Sure. And I can respond to that. If there were no cordless telephone systems before trafficking, he clearly would have had to disclose the payment. If there were no address codes before trafficking, as there was with Hawkins that had a programmable address code, he clearly would have had to disclose it. Because those would have gone to issues which trafficking would have had to address. If there were no other three-node systems that involved patient identification systems, which obviously a cordless telephone system does not, then the answer to that would be absolutely. But in this case, where you have all three, you have to ask the question, what more was there? If you take the logic. Isn't that, aren't you taking me back to the question of whether Baker was a jury? No, actually, I don't think I am. I'm taking you to the question. You are now looking at it through the shoes of a practicing attorney. And you are saying to yourself, wait a minute. I've got all, I've disclosed all of these things. Is the new rule now that under any circumstance where any, even though I know it's already been disclosed, I've got to disclose it, or that means I'm engaged in a national crime? That is what the ruling below leads to. Because, as I said, there is no, if you look at it, what was disclosed? Three-node system, cordless telephone, patient identification system. This was all disclosed. 33 different references. That's inconsistent with an intent to deceive, particularly when you combine it with the fact that the co-pending applications were disclosed to both examiners. And as you know, under the law, the examiners presumably have done the same. And the three-node system was Hawkins? Oh, there were more than one three-node system. Hawkins was the three-node system. What are the others, besides Hawkins? There were five others, Your Honor, and I don't have, I can't give you the names. I don't want to, I can't give you. Are they the same group? Yes. Yes, they are. And the importance was each of these, because as I said, the three-node system is nothing more than a computer, a base station, and a handheld. They showed three-node systems involving all sorts of applications that were even with animals, for example. And what the net effect was, that technology was before the examiner. And the addressable code was before the examiner. So all of that is evidence militating in favor of a five-node node thing. Thank you. Thank you, Mr. Johnson. Thank you, Mr. Patino. This is a unanimous submission.